UNITED STATES, Appellee

v.

JACK T. KRULL, First Lieutenant, U. S. Army, Appellant

3 USCMA 129, 11 CMR 129

No. 934

Decided July 31, 1953

Lt Col George E. Mickel, U. S. Army, Lt Col Herman P. Goebel, Jr., U. S. Army, and 1st Lt John D. Calamari, U. S. Army, for Appellant.

Lt Col Thayer Chapman, U. S. Army, and Capt Irvin M. Kent, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

On January 24, 1952, the accused pleaded guilty to two specifications alleging the larcenies of certain subsistence items of a value less than $20.00, in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. One of the thefts occurred on December 14, 1951, while the second occurred two days thereafter. Accused likewise pleaded guilty to two specifications of misappropriation of the same items. These last two specifications alleged violations of Article 133 of the Code, 50 USC § 727, which permits violations to be punished as conduct unbecoming an officer and a gentleman. In spite of the admissions of guilt, trial was held as if pleas of not guilty had been entered and witnesses called by the Government testified to facts which, when summarized, established the following sequence of events.

On or about 7:00 p. m., December 14, 1951, the accused, who was the company commander of Company B, 51st Armored Engineer Battalion, gave a list of groceries to a cook on duty in the enlisted mess of that company and ordered him to take them from the storeroom of the mess, pack them in a box and place them where they could be picked up by the accused. The cook complied with the order and the accused, who drove his car to the rear door of the kitchen mess, picked up the box, placed it in his car and drove away. The groceries generally consisted of five pounds of sugar, a loaf of bread, a jar of pickles, one pound of butter, five pounds of potatoes, eight lemons, and a couple of pounds of onions. There could have been additional items or larger quantities than those enumerated but the written list given to the cook which particularized the items was not available as it had been picked up by the accused. Some two days later, the accused brought his wife to the mess for supper.

After the meal had been finished, he entered the kitchen storeroom, took a pod of garlic and a pound of lard, placed them in his pocket and then departed. No explanation was given by the accused to the mess personnel as to why he was taking foodstuff belonging to the enlisted men's mess.

After the court-martial had announced findings of guilty the accused was asked if he desired to testify in extenuation and mitigation. He accepted the opportunity and offered the following explanation: That he had received a letter from his wife notifying him that she would arrive on or about December 14, 1951; that she had furnished him a list of groceries needed to commence housekeeping but because of the pressure of his duties, he was unable to purchase the items; that he intended to borrow them from the mess and to repay them; that he gave the cook a list but picked it up because he wanted a record of what he had taken; that on the second occasion, he was showing his wife around the mess hall when he recalled some other items she needed; and that was the reason he took the garlic and lard. Accused's wife corroborated his version of the incident to the extent that she claims to have written a letter to the accused prior to her arrival and included therein a list of staples which she desired to have him obtain.

The court-martial sentenced accused to be dismissed from the service and this sentence, together with the findings of guilt, was approved by the convening authority and a board of review in the office of The Judge Advocate General of the Army. Accused, within the time permitted by law, petitioned this Court, asking that we review the record to determine whether or not his statement in mitigation and extenuation was so inconsistent with his plea of guilty that the law officer erred in not rejecting it and substituting therefor a plea of not

guilty. We granted the petition and limited the issue to that particular question.

Article 45 (a) of the Uniform Code of Military Justice, 50 USC § 620, provides in part as follows:

"If an accused arraigned before a court-martial makes any irregular pleading, or after a plea of guilty sets up matter inconsistent with the plea, or if it appears that he has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect, or if he fails or refuses to plead, a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not guilty."

Paragraph 70 of the Manual for Courts-Martial, United States, 1951, amplifies this by providing as follows:

"In court-martial procedure, pleas include guilty, not guilty, and pleas corresponding to permissible findings of lesser included offenses. See 74b (3). The court may refuse to accept a plea of guilty and should not accept the plea without first determining that it is made voluntarily with understanding of the nature of the charge. If an accused arraigned before a court-martial makes any irregular pleading, or after a plea of guilty sets up matters inconsistent with the plea, or if it appears that he has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect, or if he fails or refuses to plead, a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not guilty (Art 45a). . . ."

Counsel for accused urges strongly that the quoted Article and paragraph commanded that the law officer, after hearing accused's statement, reject his plea of guilty and permit the case to be tried on its merits. To dispose of the contention that the plea was improvidently entered, we direct attention to the fact that this is not a case in which the findings are predicated solely on a plea of guilty. When accused entered that plea, the law officer complied with the provisions of the Manual quoted above and inquired as to whether its legal effect had been explained and was fully and completely understood by him. After having been assured that the accused had been informed properly as to his rights and that he understood the effect of his plea and that the maximum sentence could be imposed without further proof, the law officer directed the parties to proceed. Apparently all parties concluded that this direction meant to proceed with the trial as every step in a contested proceeding was taken. Challenges to members of the court-martial had been previously exercised by counsel for the accused so the next step was the statement by the law officer that he would hear the presentation of any legal authorities. When both sides disclaimed a desire to submit authorities, the taking of testimony commenced. Witnesses were examined by the Government and cross-examined by the accused. After completion of its evidence, the Government rested. The right to testify or to remain silent was explained to the accused and he elected the latter. The law officer had previously submitted his proposed instructions to counsel for both sides and they were interrogated as to any corrections, additions, deletions, or objections that they cared to make. They were also afforded an opportunity to submit special instructions. Complete instructions were then given by the law officer on all charges and specifications. The court-martial closed to deliberate on its verdict and, as previously stated, returned findings of guilty on all charges and specifications. When every step in a completed trial is carried on in the presence of an officer and his counsel, when an opportunity to hear and know the nature and extent of the Government's case is afforded the accused, when a full and fair explanation of the effect of the plea is given, and when an opportunity to testify on the merits if he so desires is suggested and an accused sits by and persists in his plea of guilty, we are unimpressed with a contention that improvidence misled him. Rather we are constrained to believe

**131**

that leniency in sentence prompted his trial strategy.

One additional matter bearing on imprudence bears discussion. We call attention to the fact that the accused was represented by a captain of the Judge Advocate General's Corps of the United States Army. He was certified as competent to defend cases tried by general courts-martial and to represent those charged with serious crimes. He represented the accused at the pretrial investigation which was held on or about the 10th day of January 1952. This was almost a month after the first offense and some two weeks before the case was tried. He was entirely familiar with the evidence which could be produced by the Government as the affidavits given to the investigating officer and used at the pretrial investigation were available to and undoubtedly read by him. In addition, we must assume that he was entirely familiar with the explanation to be given by the accused. There is a delicate question of judgment involved in permitting an accused to enter a plea of guilty and counsel should be free to exercise their discretion. There are factors for and against entering the plea which must be weighed. Counsel must make a choice as to whether his client should contest the issues and run the risk of having damaging evidence presented against him by the Government or admit the crime and seek to avoid having aggravating circumstances paraded before the court-martial. Apparently the counsel for the accused concluded to follow the latter course and possibly for a very excellent reason. A quick glance at the affidavits made by witnesses attached to the record as part of the pretrial investigation indicates that much damaging evidence might have been presented against the accused. Undoubtedly to escape this and a hope that a statement in mitigation in which the accused would seek to lessen the gravity of the offense and thereby obtain consideration on the sentence, were the motives influencing counsel to proceed as he did. This hardly smacks of improvidence. On the contrary, it indicates a well-considered plan to assist the accused. Because the sentence imposed was greater than that hoped for, is not sufficient to justify a claim by counsel on appeal that the plea was improvidently entered.

The next contention requires that we dispose of the question as to whether the statement in mitigation ▆▆▆▆▆ ▆ raised any defense to the charges. Assuming for the purpose of this case that the law officer was duty bound to accept the story related by accused, without regard to its contradictions, we conclude it failed to state a defense and that it was not inconsistent with the plea. On the contrary, it established that accused was guilty of the offenses charged. We need say little about the two specifications alleging misappropriation as accused admitted every element of that offense and particularly did he establish an intent to deprive the Government of its property for a temporary period. The larceny specifications present a more complicated issue but it must be resolved against the accused. There can be no question about the fact that his statement conclusively established that he intended to deprive the Government permanently of the particular property he misappropriated as it was consumed. What we are assuming he established is this: That he intended to return equivalent property. The Manual for Courts-Martial, United States, 1951, contains a provision which covers that particular situation. Paragraph 200 (a), page 360, contains the following language:

"An intention to pay for the property stolen or otherwise to replace it with an equivalent is not a defense, even though such an intention existed at the time of the theft, and, once a larceny is committed, a return of the property or payment for it is no defense."

Unless we can ignore that language the accused raised no matter inconsistent with his plea. We need ▆▆▆▆▆ ▆ not delve into the refined differences between larceny and embezzlement and as to how the wording might be applied to each as the Code has combined both into the principal offense of larceny or the included offense of misappropriation. (See Article 121, 50 USC § 715.)

Therefore, the only authority we could seize upon to ignore the plain wording of the Manual would be that found in the Code which provides that the rules and regulations promulgated by the President must not be inconsistent with or contrary to the Code. We are unable to reach a conclusion that the language necessarily runs contra to the definition of larceny as found in Article 121. The two can be reconciled, and it is our duty to so interpret them. The Code mentions the deprivation of property permanently and the Manual states in substance that Congress meant the identical property. There is respectable civilian authority which supports the Manual statement and there is good authority contrary thereto. This division of authorities shows that we do not stand alone in our belief that the two provisions are not inconsistent and those supporting the Manual rule furnish an answer to the charge that the rule was promulgated with utter disregard for the element of criminal intent necessary to establish an offense.

The accused challenges the Manual provision as announcing an unreasonable and unjust law. It undoubtedly follows the more stringent rule and while we need not support the wisdom of legislation we do point out that there is a good basis in reason for the military to adopt a harsh principle. The barracks and ration thieves cause immeasurable damage to military discipline and morale. They have always been punished summarily and severely. This case furnishes a classic example of the damages that might flow from a different rule. Imagine the reaction of the enlisted personnel of the company when they know their commander is supplying his home with their rations. If he can appropriate, either permanently or temporarily, they should be entitled to exercise the same privilege. If he can secrete a pound of lard under his field jacket and take it home, so can they. The end result is that the first man to the kitchen has the best home larder. When caught, they all intend to return the equivalent, as did this officer, but when? His statement does not reflect a return of any property and it was made some six weeks after the tak-

ing. Be that as it may, the potentiality for harm to the military order from any unauthorized taking of property belonging to the Government or other military person is so great that strict rules and regulations must be enacted to discourage it. It is so easy to take, and then when apprehended to claim an intent to replace, that there is good reason for the rule that any taking without permission from the owner is unlawful. Certainly a rule to that effect is not contrary to the Code or to common sense. We must, therefore, support the rule as written.

The decision of the board of review is affirmed.

BROSMAN, Judge (concurring in the result):

I fully concur in the result reached in this case by Judge Latimer. However, I would prefer to bottom our necessary action solely and only on the notion that there was no inconsistency between the pleas of the accused, on the one hand, and his statement in extenuation, on the other—and in this respect I find myself in flat disagreement with the Chief Judge. If I am correct in this view, it follows that there was no shadow of necessity for the substitution of pleas of not guilty in the accused's behalf, and that the findings and sentence are supported by the pleas of guilty entered by him following arraignment.

Lieutenant Krull was here tried under four specifications, two alleging larceny and two wrongful appropriation—the latter alleged as conduct unbecoming an officer and a gentleman, in violation of Article 133. It is clear beyond peradventure that there was no inconsistency between his story in mitigation and his plea of guilty to wrongful appropriation. Assuming the complete accuracy of his extenuative explanation, he manifestly deprived the Government of its property temporarily at the very least; he certainly appropriated this property to his own use; and he must necessarily have intended to accomplish both of these purposes. The larceny specifications present a problem of somewhat greater complexity. Even

**133**

here, however, I am sure that, under current military law, the officer's post-findings account of the transactions, of itself, rendered him guilty of the crimes alleged—and thus that no inconsistency resulted therefrom.

The Manual for Courts-Martial, United States, 1951, paragraph 200a, contains the following language:

> "An intention to pay for the property stolen or otherwise to replace it with an equivalent is not a defense, even though such an intention existed at the time of the theft, and, once a larceny is committed, a return of the property or payment for it is no defense."

Under this language it must be obvious that the accused, by his own story, furnished a complete basis for his conviction of the larcenies alleged—and quite apart from his earlier pleas of guilty. He admitted taking wrongfully the Government property specified, although he professed an intention—existing at the time of the misappropriation—to replace it in kind. Pretermitting any question of exact equivalence, it is apparent from the quoted Manual language that these intentional professions constitute no defense. It is also apparent that this language must supply our answer in the present case—unless somehow it is in conflict with the provisions of the Uniform Code. I cannot see that it is.

In United States v. Aldridge (No. 686), 2 USCMA 330, 8 CMR 130, decided March 24, 1953, we dealt at length with the meaning and objectives of Article 121, proscribing larceny and defining the offense. There we concluded that it was the manifest intent of Congress to create a single inclusive offense of larceny, and to abolish technical distinctions theretofore existing among the earlier crimes of larceny, embezzlement and taking under false pretenses. We also concluded that the gist of the statutory offense—indeed that which binds the older offenses together in the new conception—is found in the requirement of an intent permanently to deprive the owner of his property. Now the only theory under which I might

come to believe that conflict exists between the Code and the Manual here involves the notion that the common—or indeed the Federal—law of the subject is recognizably at variance with the Manual rule, and that this divergent view was adopted elliptically by Congress when it enacted Article 121. And I just do not believe these things to be true. While there is some slight civilian authority for the position that the presence of a coexisting intention to return a chattel in kind is fatal to guilt of larceny, this view is *not* well-settled, and has been questioned by sound scholars in terms of both history and analysis. Actually the general decay of the doctrine of lucri causa, and its clear repudiation in Article 121, argues in a contrary direction so far as military law is concerned. And this is also true of the civilian cases involving embezzlement—now a part of the codal crime of larceny. State v. Pratt, 114 Kan 660, 220 P 505; Morrow v. Commonwealth, 157 Ky 486, 163 SW 452; see Fowler v. Wallace, 131 Ind 347, 31 NE 53. For a statement of the historic common law position, see Kenny, Outlines of Criminal Law (1952 ed.), 243.

We have said many times that—in the absence of conflict—the Code and the Manual share an identical authoritative position. I cannot possibly find conflict here. It follows that the Manual language controls in the present problem, and that an intention to return in kind is wholly irrelevant to any consideration of guilt of larceny. It is, of course, unnecessary for me to express any sort of personal opinion of the Manual view in terms of function—that is, any choice as to the rule I would adopt as a law-maker.

QUINN, Chief Judge (dissenting):

I dissent.

Article 45(a) of the Uniform Code of Military Justice, 50 USC § 620, provides explicitly that if an accused arraigned before a court-martial sets up a matter inconsistent with a prior plea of guilty, "a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not guilty." This accused pleaded

guilty to larceny in violation of Article 121 of the Code, 50 USC § 715, and misappropriation as conduct unbecoming an officer and a gentleman in violation of Article 133 of the Code, 50 USC § 727. After the findings, the accused stated that he only intended to borrow the items in question, and presented an altogether credible version of the events leading up to the takings. This statement completely negatived the existence of an animus furandi and, therefore, conclusively demonstrated a fatal deficiency in his understanding of the charges and of the meaning and effect of his plea.

It would be difficult for me to imagine a clearer case of matter inconsistent with the plea in the words of Article 45 (a), supra. It matters not that this inconsistency was developed after the findings were made. Under the provisions of Article 45(a), supra, the law officer had no choice but to order the plea of guilty withdrawn, a plea of not guilty entered, and to direct the court to reconsider its findings in the light of the additional evidence. I find nothing in the Article which authorizes the law officer and the court to disbelieve the inconsistent matter and thus avoid compliance with the mandate of the Article.

Had any individual assigned to the accused's organization desired to borrow the items described in the specifications, agreeing to replace them in kind at a later date, the accused's permission as mess officer would be required. No one would suggest that the borrower was a thief and that the accused was a principal in the commission of larceny under the circumstances. If he had authority to loan to others, he surely was reasonable in assuming he had authority to borrow himself. Doubtlessly, it would have been more prudent to obtain the permission of his superiors. But he was not tried for imprudence; he was tried as a thief, and as one not fit to be called an officer and a gentleman. To establish the commission of these offenses it was incumbent upon the Government to establish the criminal intent of the accused. His statement negatived this intent, and the majority opinion would have us believe that it serves only to establish the offenses charged. To support this theory, reliance is placed upon the following portion of paragraph 200a, page 360, Manual for Courts-Martial, United States, 1951:

"An intention to pay for the property stolen or otherwise to replace it with an equivalent is not a defense, even though such an intention existed at the time of the theft, and, once a larceny is committed, a return of the property or payment for it is no defense."

The principal difficulty with this approach is that it ignores the plain terms of the authority relied upon. It presumes the commission of larceny as its starting point, and then declares the statement is not a defense because the larceny was shown. This is a concrete example of lifting one's self by his bootstraps. The fact is, that in the absence of an animus furandi, no crime was committed.

By failing to order the entry of a plea of not guilty, and to direct the court to reconsider its findings, the law officer, and the majority of this Court, fell into the error held reversible by the United States Supreme Court in Morissette v. United States, 342 US 246, 96 L ed 288, 72 S Ct 240. In that case the defendant, charged with "unlawfully, willfully, and knowingly" stealing and converting property of the United States, asserted he had discovered the articles alleged to have been stolen, while hunting, and believing they were abandoned, took them. He denied an intent to steal, or any wrongful or criminal intent. The trial judge ruled this was no defense. Upon appeal Mr. Justice Jackson, speaking for the court, declared:

"Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. State court authorities cited to the effect that intent is relevant in larcenous crimes are equally emphatic and uniform that it is a jury issue. The settled practice and its reason are well stated by Judge Andrews in People v. Flack, 125 NY 324, 334, 26 NE 267, 270, 11 LRA 807:

**135**

'It is alike the general rule of law and the dictate of natural justice that to constitute guilt there must be not only a wrongful act, but a criminal intention. Under our system (unless in exceptional cases), both must be found by the jury to justify a conviction for crime. However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and jury are distinct, the one responding to the law, the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury. . . .'

"It follows that the trial court may not withdraw or prejudge the issue by instruction that the law raises a presumption of intent from an act. It often is tempting to cast in terms of a 'presumption' a conclusion which a court thinks probable from given facts. . . .

"We think presumptive intent has no place in this case. A conclusive presumption which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense. A presumption which would permit but not require the jury to assume intent from an isolated fact would prejudge a conclusion which the jury should reach of its own volition. A presumption which would permit the jury to make an assumption which all the evidence considered together does not logically establish would give to a proven fact an artificial and fictional effect. In either case, this presumption would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime. Such incriminating presumptions are not to be improvised by the judiciary. Even congressional power to facilitate convictions by substituting presumptions for proof is not without limit. . . ."

After the accused had entered his guilty pleas, the majority very readily equates the introduction of evidence to establish a prima facie case to a situation in which trial was held as if pleas of not guilty had been entered. It is clear that the procedure followed here conformed to the established practice of Army courts-martial to receive evidence of the crime charged "with a view to determining the actual criminality of the offender and the measure of punishment which should properly be executed, in any case in which such evidence . . . [is] deemed to be essential to the due administration of military justice." Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 279. To conclude from the application of this custom of the service that any real issue was in contest, after the entry of the pleas of guilty, is pure sophistry.

It is contrary to law, reason, and common sense to assume blithely, as does the majority, that the matter is of little consequence, since the result would have been the same had a trial been held upon a plea of not guilty. The strongest proof known to law is a judicial confession of guilt. This court was quite at liberty to rely, in its verdict, solely on the accused's plea of guilty. We have no way of knowing what their verdict would have been if they had had before them the accused's explanation of his actions. The majority opinion seems to indicate that the complete denial of guilt, necessarily implicit in a plea of not guilty, is of little consequence in our system of criminal justice. The majority opinion reduces itself to this—the accused deserves to be dismissed from the service so we need not concern ourselves with the procedures required and protections afforded by the Uniform Code of Military Justice.