UNITED STATES, Appellee

v.

William H. ROANE, Jr., Airman Basic
U.S. Air Force, Appellant.

No. 94–0212.
CMR No. S28556.

U.S. Court of Appeals for
the Armed Forces.

Argued May 31, 1995.

Decided Sept. 28, 1995.

For Appellant: *Colonel Jay L. Cohen* (argued); *Captain Gilbert J. Andia, Jr.* (on brief).

For Appellee: *Colonel Thomas E. Schlegel* (argued); *Colonel Jeffery T. Infelise* (on brief).

*Opinion of the Court*

WISS, Judge:

1. In May 1991, appellant was tried by a special court-martial military judge sitting alone at Bitburg Air Base, Federal Republic of Germany. Pursuant to his pleas, appellant was found guilty of unauthorized absence (3 specifications—9, 3, and 2 days) and of wrongfully obtaining phone services, in violation of Articles 86 and 134, Uniform Code of Military Justice, 10 USC §§ 886 and 934, respectively. Appellant was sentenced to a bad-conduct discharge, as well as confinement and forfeiture of $250.00 pay per month for 3 months. The convening authority approved the sentence. The Court of Military Review[1] affirmed these results in an unpublished opinion.

2. This Court granted review on the two issues[2] that appellant presented but combined them into the following issue:

WHETHER APPELLANT'S PLEA WAS PROVIDENT SINCE THE MILITARY JUDGE DID NOT SUFFICIENTLY INQUIRE AS TO APPELLANT'S INTENT AFTER APPELLANT MADE STATEMENTS WHICH WERE INCONSISTENT WITH GUILT AND APPELLANT'S INTENT AT THE TIME OF THE OBTAINING WAS NOT ESTABLISHED.

3. We hold that the military judge did not abuse his discretion by accepting appellant's guilty pleas to wrongful taking by false pretenses, as the military judge in the providence inquiry properly elicited facts to estab-

---

1. *See* 41 MJ 213, 229 n. * (1994).

2. Issues I and II as presented by appellant stated:

I

WHETHER APPELLANT'S PLEA WAS PROVIDENT SINCE THE MILITARY JUDGE DID NOT SUFFICIENTLY INQUIRE AS TO AP-

PELLANT'S INTENT AFTER APPELLANT MADE STATEMENTS WHICH WERE INCONSISTENT WITH GUILT.

II

WHETHER APPELLANT'S PLEA OF GUILTY WAS PROVIDENT SINCE APPELLANT'S INTENT AT THE TIME OF THE OBTAINING WAS NOT ESTABLISHED.

lish appellant's intent to defraud at the time he used his roommate's telephone account without prior authorization. Appellant's statements during the providence inquiry that he kept a record of his unauthorized telephone calls and that he intended to reimburse his roommate for the calls when he had the money did not reasonably raise a defense, and neither of these matters was inconsistent with his pleas of guilty.

## I

4. The present issue relates to Charge II and its single specification alleging that appellant used false pretenses in obtaining telephone services. Simply stated, appellant used his absent roommate's telephone account without authority.

5. Airman First Class (A1C) Kenneth Wright occupied a dormitory room at Bitburg Air Base. He arranged with the Deutsches Bundespost for a telephone connection in this room and a personal telephone account. On January 21, 1991, the day of his deployment for several weeks, he secured his telephone in his individual locker, but he did not terminate the room's telephone connection or his account. Thus, it was possible for anyone merely to plug another telephone into the active connection and to charge calls to Wright's account.

6. Four days later, appellant moved into this dormitory room, and he knew that Wright was his absent roommate. In an attempt to obtain telephone service, appellant went to the Deutsches Bundespost where he was told there was already a telephone connection in the room. While the record does not expressly address whether appellant attempted to obtain another connection in the room for himself, it is unequivocally clear that he knew that the existing telephone connection and account were exclusively in the name of A1C Wright and that appellant desired to avoid paying connecting fees to obtain his own account.

7. Appellant then made his serious mistake. Without the permission of the Deutsches Bundespost, his roommate, or any other authority, he plugged his own German telephone into the telephone connection is-

sued to Wright, thereby accessing Wright's account. Thereafter, he began to make telephone calls, including several long-distance calls to the United States. Appellant knew that all his calls would be charged to Wright's account.

8. On March 19, 1991, A1C Wright returned from his deployment; and on April 23, 1991, he received his March telephone bill of DM 875.19 that covered the period in which he continuously was deployed. Although appellant previously had told Wright (at a time not disclosed in the record) that he "had used the phone," appellant had not disclosed the extent of his usage of Wright's account. When Wright examined the bill, he thought it was "too high" and confronted appellant, who again "admitted" billing his personal calls to Wright's telephone account and for the first time promised to repay him. Appellant failed to pay for his unauthorized telephone calls, however, and was charged later with and pleaded guilty to wrongfully obtaining telephones services under false pretenses.

9. At the court-martial, appellant's initial disclosures during the providence inquiry corroborated his guilty pleas. He admitted that he had "intended to defraud the telephone company" and A1C Wright and that he knew that using his roommate's telephone line was "wrong" and criminal. Appellant also told the military judge that, when Wright confronted him about the excessive telephone charges, he promised to reimburse Wright when he had the money. As of the time of trial, however, appellant had failed to pay Wright for the unauthorized telephone calls.

10. The present legal issue arises from appellant's statements during the providence inquiry that he had kept a log of his telephone calls and that he had intended to reimburse Wright for them when he had the money. Appellant claims these revelations were inconsistent with his pleas of guilty to wrongfully obtaining services under false pretenses, as they establish that he had no criminal intent to defraud. Appellant concludes that, since the military judge failed to resolve this alleged inconsistency, his pleas

were improvident. The Government, of course, disagrees.

11. The following is the relevant portion of the providence inquiry:

Q: Basically tell me how you got into the telephone service.

A: I went to the Bundespost to try to get a line put in and they told me that there was already one in that room.

Q: You told me that you were roommates with A1C Wright, you didn't know that already?

A: I moved after he already left to Turkey.

Q: So at this time A1C Wright was not your roommate initially?

A: No, Sir.

Q: Did you even know who he was?

A: Yes, Sir.

Q: So you got a line already in the room. What did you do?

A: So I had used my phone to make telephone calls. I kept count of how much my total was on the telephone, how many clicks I used.

Q: In other words, you plugged your phone into his jack, his wire?

A: Yes.

Q: And you know basically how that works? They tab up to whoever is supposed to be the guy that owns the wire.

A: Yes, Sir.

Q: So you are getting all these phone calls and they are clicking up to his account. Right?

A: Yes, Sir.

Q: Where were you calling?

A: To the States, Sir.

Q: Do you have any idea about how many times you called?

A: Not offhand, Sir, no.

Q: More than ten?

A: Not that many times.

Q: Somewhere between five and ten?

A: Yes, Sir.

Q: Do you remember about how long you talked on each of the phone calls, an overall amount of minutes?

A: Roughly—maybe an average of at least a half-hour for each phone call.

Q: Were you using any type of an AT&T dialing or anything like that?

A: No, Sir.

Q: You were just calling straight through the international lines?

A: Yes, Sir.

Q: How many clicks did you have logged? Do you remember?

A: Well, it was totalling in marks and minutes.

Q: I mean on your phone you have these little numbers, the units.

A: The kind of phone I had it had the marks, how many marks I had used, it was pre-programmed for 30 pfennigs a click. It totaled the amount in marks, not clicks.

Q: So basically you kind of knew about what the money value would be in marks as opposed to the number of units that clicked off?

A: Yes, Sir.

Q: Here it says that A1C Wright's phone bill was for DM 1134.73. Is that basically what you had on your phone?

A: Yes, Sir.

Q: Did you ever get permission from Wright to use his telephone connection?

A: No, Sir.

Q: Did you ever tell the Bundespost that you were going to be using Wright's telephone connection?

A: No, Sir.

Q: So basically you just plugged in and as far as the Bundespost knew it was Wright making the phone calls?

A: Yes, Sir.

Q: *So you understand that that was your false pretense?*

A: *Yes, Sir.*

Q: *By that deed you made the telephone company think that it was Wright?*

A: *Yes, Sir.*

Q: And you knew it wasn't Wright, obviously, because it was you. Correct?

A: Yes, Sir.

Q: *So you intended to defraud the telephone company by getting this service without having to pay all kinds of connecting fees and etc. etc.*

A: *Yes, Sir.*

Q: *And also you were defrauding Wright, because you were using his line and you didn't get his permission. Correct?*

A: *Yes, Sir.*

Q: Do you agree that the total amount of service you got was over $100.00?

A: Yes, Sir.

Q: In other words, if you had had to pay the bill yourself it would have been more that $100.00?

A: Yes, Sir.

Q: *Did you understand that it was wrong?*

A: *Yes, Sir.*

Q: *Did you know it was against the law, just to get this free telephone service, or did you figure it might be?*

A: *Yes, Sir.*

Q: Now Wright doesn't come back until the 19th of March. Is that correct?

A: Yes, Sir.

Q: And he gets a phone bill a couple of days later?

A: Yes, Sir.

Q: Had any phone bills come in for him, that you know of, between January and March?

A: No, Sir.

Q: Because you don't have access to his box. Right?

A: Yes, Sir.

Q: Did he comment about any other phone bills, other than the one he received in late March?

A: No, Sir.

Q: Do you remember about how much it was for?

A: (No response.)

Q: The stipulated figure is DM 875. Does that sound about right?

A: He never really told me offhand how much it was.

Q: Did he ever confront you about the bill?

A: Yes, Sir.

Q: Because you were still in the room at that time, weren't you?

A: Yes, Sir.

Q: So he comes home and finds a roommate, you.

A: Yes, Sir.

Q: What was the basic conversation between you two?

A: The day he came back?

Q: No, when he got his bill and said, "Good Lord, I couldn't have used it that much since I wasn't here."

A: I told him previously that I had used the phone, but he didn't know that it was going to be that much—I didn't tell him how much it was going to be. When he got the bill he told me about it and I told him that I would pay for it.

Q: Did you?

A: No, Sir.

Q: You still haven't?

A: No, Sir.

(Emphasis added.)

12. Additionally, a Stipulation of Fact stated in part:

6. Between on or about 21 January 91 and on or about 21 March 91 Airman Basic Roane wrongfully obtained telephone services from A1C Kenneth A. Wright and the Deutsches Bundespost. On 21 Jan, A1C Wright secured his phone in his individual locker in his dormitory room, Building 169, Room 414B, Bitburg Air Base, because he was departing that day to Tur-

key TDY in support of Operation Proven Force. However, A1C Wright's phone service was continued while he was TDY. Airman Basic Roane was moved into A1C Wright's room on or about 25 Jan 91. Airman Basic Roane used his own Bundespost telephone to plug into the connection authorized only for A1C Wright's use. This enabled Airman Basic Roane to use A1C Wright's account with the German Bundespost to incur charges. Airman Basic Roane kept track of the meter on his own phone as to how much time he was using on A1C Wright's line. Airman Basic Roane's use of A1C Wright's telephone services was done under false pretenses as he knew his use of the phone was wrongful and without A1C Wright's knowledge or permission. Airman Basic Roane intended to defraud A1C Wright and the German Bundespost with his use of A1C Wright's telephone services. A1C Wright's phone bill was DM 1134.73. Airman Basic Roane's record of how much he used equals an excess of $100.00. A1C Wright was continuously TDY out of the country until 19 March 1991.

## II

■ 13. This Court has held that theft of telephone services is a fraud punishable under Article 134. *United States v. Herndon,* 15 USCMA 510, 36 CMR 8 (1965); *see also United States v. Flowerday,* 28 MJ 705, 708 (AFCMR 1989) (caller guilty of obtaining services under false pretenses when he "intentionally invokes long distance telephone service ... and possesses the intent to defraud the telephone company of the value of that service"). The Article 134 offense of obtaining services by false pretenses has the following elements:

(1) That the accused wrongfully obtained certain [telephone] services;

(2) That the obtaining was done by using false pretenses;

(3) That the accused then knew of the falsity of the pretenses;

(4) That the obtaining was with the intent to defraud;

(5) That the services were of a certain value; and

(6) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 78b, Part IV, Manual for Courts–Martial, United States, 1984. The intent to deprive or defraud permanently must accompany the wrongful obtaining. *See United States v. Herndon, supra; see also* para. 46c(1)(f)(i), Part IV. As appellant pleaded guilty to the charged offense, our particular concern in light of appellant's argument before this Court is whether the record adequately establishes that appellant obtained the telephone services with the intent to defraud.

■ 14. Article 45(a), UCMJ, 10 USC § 845(a), is a codal mandate to reject a guilty plea if the accused "sets up matter inconsistent with the plea...." In this respect, military practice differs from that in other federal courts that permit the accused to plead guilty even though the defendant personally professes innocence—a so-called "*Alford* plea," *see North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); *United States v. Logan,* 22 USCMA 349, 351, 47 CMR 1, 3 (1973). Before accepting a plea of guilty, therefore, a military judge must conduct a thorough inquiry to insure the accused understands the meaning and effect of the plea, that he enters it voluntarily, and that he in fact is guilty of the offense. *United ed States v. Davenport,* 9 MJ 364 (CMA 1980); *United States v. Care,* 18 USCMA 535, 40 CMR 247 (1969); RCM 910, Manual, *supra.*

■ 15. For an accused's testimony in the providence inquiry to rise to the level of inconsistency contemplated by Article 45, the testimony must have "reasonably raised the question of a defense," *see United States v. Timmins,* 21 USCMA 475, 479, 45 CMR 249, 253 (1972), or it must be patently inconsistent with the plea in some respect, *see United States v. Welker,* 8 USCMA 647, 25 CMR 151 (1958). This Court long ago explicitly rejected the argument that "the mere possibility" a

defense exists is sufficient to require rejection of a guilty plea. *United States v. Logan,* 22 USCMA at 351, 47 CMR at 3. Instead, we have followed a "substantial-conflict" standard for determining when matters are present that require rejection of a guilty plea. *United States v. Stewart,* 29 MJ 92, 93 (CMA 1989); *accord United States v. Prater,* 32 MJ 433, 436 (CMA 1991). This rule is rooted, in part, in our respect for the obvious tactical decision by an accused and his counsel to forgo possible defenses that they know in all likelihood will not persuade the factfinder. 22 USCMA at 350, 47 CMR at 2.

16. In determining the providence of a guilty plea, the scope of review is limited to the record of the trial. *United States v. Bartell,* 32 MJ 295, 297 (CMA 1991); *United States v. Rooks,* 29 MJ 291 (CMA 1989). Viewing the providence record in this case, we find that none of appellant's statements regarding his actions or intent to defraud is in substantial conflict with his guilty plea. Appellant readily admitted he had used his roommate's telephone account without the consent or knowledge of the roommate or the telephone company. Appellant admitted that his actions were wrong and criminal. He specifically admitted that he intended to defraud A1C Wright and the telephone company by getting service and by doing so without paying for the connection fee.

17. It is important to note that appellant did not disclose the extent of his unauthorized use of the telephone *immediately* upon A1C Wright's return from deployment. While the time and substance of his initial disclosure of his telephone usage is not fully developed, Wright's reaction of outrage upon receiving the exorbitant telephone bill in April demonstrates that appellant's earlier mention of this matter only was a general and insufficient disclosure. It lacked the accuracy and candor required to view this as an exculpatory matter. Only after Wright confronted appellant did he disclose the full scope of his misuse of Wright's telephone account and attempt to rectify the situation by promising restitution when he had funds and when problems with his pay account were resolved. Appellant's financial prob-

lems and his stated desire to obtain telephone services and to do so without having to pay connecting fees reveal his apparent financial motive for the offenses and further establish his intent to defraud. Finally, appellant's failure to repay A1C Wright for the telephone calls renders his belated and avowed intention to reimburse Wright disingenuous at best.

18. We do not view appellant's keeping a log of his unauthorized telephone calls, alone, to be an exculpatory matter, particularly when appellant failed to disclose timely this information to Wright. Appellant may not surreptitiously and without any proper authority obtain services without payment and then avoid prosecution by a mere statement of intention to pay for the services when funds are available in the future. *See United States v. Krull,* 3 USCMA 129, 11 CMR 129 (1953); *see also* para. 46c(1)(f)(iii)(B), Part IV.

19. At the termination of the providence inquiry, the military judge asked defense counsel if there were any defenses to the charged offenses. Counsel responded that he was not aware of any defense. We agree with this view of these facts. We also agree with the conclusion of the Court of Military Review that appellant intended to defraud A1C Wright and the German telephone company when he made his first unauthorized telephone call. *See United States v. Flowerday,* 28 MJ at 708. Thus, the pleas were provident.

### III
The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX and CRAWFORD concur.

GIERKE, Judge (dissenting):

20. I disagree with the majority's conclusion that appellant's responses to the military judge were not inconsistent with his guilty pleas. Appellant told the military judge that he attempted to obtain a telephone line from the Bundespost and was informed that there already was a line in the room. He kept track of the cost of his calls and informed his

roommate before the telephone bill arrived that he had been using the telephone. When the bill arrived, appellant offered to pay for his calls.

21. In my view, appellant's answers are inconsistent with an intent to defraud. His agreement with the military judge's legal conclusion that his conduct constituted fraud is insufficient to resolve the inconsistency.

*See United States v. Terry,* 21 USCMA 442, 443, 45 CMR 216, 217 (1972) ("general questions phrased to elicit only conclusions" insufficient).

22. In my view the pleas of guilty to Charge II and its specification were improvident. Accordingly, I would set aside the conviction of that Charge and its specification.