# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting *En Banc*
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private E1 KEITH R. HAWKINS**
**United States Army, Appellant**

ARMY 20120070

Headquarters, 101st Airborne Division (Air Assault) and Fort Campbell
Timothy Grammel, Military Judge
Lieutenant Colonel Jeff A. Bovarnick, Staff Judge Advocate

For Appellant: Lieutenant Colonel Imogene M. Jamison, JA; Major Jacob D. Bashore, JA; Lieutenant Colonel Katherine A. Lehmann, JA (on brief); Colonel Kevin Boyle, JA; Major Vincent T. Shuler, JA; Lieutenant Colonel Katherine A. Lehmann, JA (on brief in response to specified issues).

For Appellee: Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Catherine L. Brantley, JA; Captain T. Campbell Warner, JA (on brief and on brief in response to specified issues).

18 April 2014

---------------------------------
OPINION OF THE COURT
---------------------------------

CAMPANELLA, Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of failing to obey a lawful general regulation by possessing synthetic cannabinoids and wrongfully manufacturing methamphetamine, in violation of Articles 92 and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 912a [hereinafter UCMJ]. The military judge sentenced appellant to a bad-conduct discharge, confinement for ten months, and forfeiture of all pay and allowances. The convening authority approved only so much of the sentence as provided for a bad-conduct discharge and confinement for nine months.[1] The

---

[1] The convening authority deferred automatic and adjudged forfeitures until action. At action, the convening authority waived the automatic forfeitures for a period of six months. The pretrial agreement limited the maximum period of confinement to fifteen months. The record contains no explanation of the one-month reduction in confinement provided by the convening authority in his action.

convening authority credited appellant with forty-four days against the sentence to confinement.

This case is before us for review pursuant to Article 66, UCMJ. Appellant raises one assignment of error, claiming the Article 112a, UCMJ, charge and its specification of manufacturing methamphetamine should be dismissed. Appellant asserts the government possessed exculpatory information that indicated the substance produced was not actually methamphetamine. Appellant further asserts the government's failure to disclose this information is a constitutional due process violation. We find this matter warrants discussion and relief.

## BACKGROUND

Appellant lived on-post at Fort Campbell, Kentucky. He shared his two-bedroom quarters with another soldier, Private First Class (PFC) BB, and that soldier's wife, TS.[2]

On 25 September 2011, PFC BB asked appellant to purchase pseudoephedrine for him and his wife, expressly intending to use it to manufacture methamphetamine. Knowing PFC BB's intention, appellant purchased the pseudoephedrine and gave it to PFC BB and TS.

That same day, appellant became aware that PFC BB was manufacturing methamphetamine inside appellant's quarters when he smelled "chemicals" emanating from the laundry room. When appellant checked to see what was causing the odor, he found PFC BB and TS "making meth." Appellant, surprised that PFC BB was manufacturing methamphetamine inside his quarters, told PFC BB to immediately stop and to leave the house by the next morning.

The next morning, appellant observed that "everything [was] out of the house," but PFC BB and his wife had not left. Appellant and PFC BB then went to physical training. Afterwards, PFC BB asked appellant again to buy him pseudoephedrine. Again, knowing PFC BB's purpose was to manufacture methamphetamine, appellant bought PFC BB the pseudoephedrine. Appellant also purchased synthetic cannabinoids that morning.

Later that day, appellant reported PFC BB's methamphetamine manufacturing enterprise to his chain of command and gave his consent to search his quarters. A search was conducted and a makeshift methamphetamine lab was found. The dangerous materials from the lab were destroyed by local civilian law enforcement at the request of Fort Campbell authorities. The remaining lab materials and chemicals

---

[2] Private First Class BB and his wife were living in appellant's quarters pending approval of a Basic Housing Allowance request.

were seized by Army criminal investigators and sent to a laboratory for drug testing. Synthetic cannabinoids were also seized from the home.

The original charges preferred against appellant included, *inter alia,* Article 112a, UCMJ, wrongful manufacture of methamphetamine, as well as attempted manufacture of methamphetamine, a violation of Article 80, UCMJ.

Prior to the government receiving the drug test results from the laboratory, appellant entered into a pretrial agreement with the government to plead guilty to the wrongful manufacture of one gram of methamphetamine, and to an Article 92, UCMJ, offense for failing to obey a lawful general regulation by possessing synthetic cannabinoids. In exchange, the government agreed to limit appellant's sentence to confinement and to dismiss with prejudice all of the charges and specifications to which appellant pleaded not guilty, including the attempted manufacture of methamphetamine.

As part of the pretrial agreement, appellant agreed to enter into a stipulation of fact with the government. A civilian police seizure report attached as an enclosure to the stipulation of fact indicated that *5.5 grams of methamphetamine* had been seized from appellant's home.

On 24 January 2012, consistent with the pretrial agreement, the providence inquiry, and the stipulation of fact, the military judge accepted appellant's pleas of guilty and dismissed with prejudice the Article 80, UCMJ, charge and its specification of attempted manufacture of methamphetamine.

While in confinement, appellant encountered PFC BB, who had been tried after appellant's court-martial. Private First Class BB informed appellant that PFC BB and his wife had apparently been unsuccessful in their attempts to actually create methamphetamine in appellant's quarters on 25 and 26 September 2011. Accordingly, PFC BB only pleaded guilty to and was convicted of *attempted* manufacture of methamphetamine.

By the time appellant learned this information from PFC BB, the convening authority had already taken action on appellant's case.

Appellant asks this court to consider materials outside his record of trial, but within PFC BB's record of trial, to determine whether the government possessed exculpatory information or not. The materials from PFC BB's record of trial include: (1) an excerpt from PFC BB's Article 32, UCMJ, pretrial investigation's non-verbatim summarized transcript; (2) PFC BB's offer to plead guilty; (3) the stipulation of fact from BB's case; (4) PFC BB's charge sheet; and (5) an excerpt from PFC BB's trial transcript.

Private First Class BB's Article 32, UCMJ, investigation took place on 7 February 2012, fourteen days after appellant's guilty plea and conviction. The investigation transcript contains summarized testimony from an Army drug suppression agent who testified that on the preceding Friday (3 February 2012), Army criminal investigators received the chemical laboratory results for the substances submitted for testing from the methamphetamine laboratory crime scene at appellant's home. In response to government questions about the government laboratory results, the agent stated "no meth was revealed, just the precursors to create meth such as Sudafed," but on cross examination, the agent further stated "we are still unsure of [sic] what [PFC BB] had at the scene was meth." In PFC BB's case, the government stipulated that the unknown substance created was not, in fact, methamphetamine.

The actual laboratory results are not included in the materials submitted to this court for review by appellant. Appellant submits that, to date, the government has not provided him the actual results of the laboratory drug tests. Appellate defense counsel has not asked this court to order such a disclosure. There is nothing in appellant's record of trial or appellate filings to suggest that appellant requested discovery of such evidence before, during, or after his court-martial.

## LAW AND DISCUSSION

At the outset, we note this opinion addresses the government's obligation to disclose exculpatory information involving appellant's case that is within its possession post-trial but prior to action by the convening authority.

This opinion does not address Rule for Courts-Martial [hereinafter R.C.M.] 1210 or Article 73, UCMJ, regarding appellant's right to petition for a new trial based on newly discovered evidence. Nor do we address R.C.M. 910(j) regarding appellant's waiver of objections to the factual basis upon which his plea of guilty was made. To the extent that we consider information outside the record, we do so for the purposes of analyzing the collateral matter of due process—not for legal sufficiency purposes. *See United States v. Roane*, 43 M.J. 93, 99 (C.A.A.F. 1995); *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993); *United States v. Davenport*, 9 M.J. 364, 367 (C.M.A. 1980); *United States v. Peele*, 46 M.J. 866, 868 (Army Ct. Crim. App. 1997).

Further, this opinion does not address R.C.M. 701(d) which places a time limit on the discovery requirement stating, "[i]f, *before or during* the court-martial, a party discovers additional evidence or material previously requested or required to be produced . . . that party shall promptly notify the other party or the military judge of the existence of the additional evidence or material." R.C.M. 701(d) (emphasis added).

In his assignment of error, appellant asserts the Article 112a, UCMJ, charge and its specification should be dismissed based on a due process violation. Specifically, appellant alleges: (1) before the convening authority took action, the government possessed exculpatory information; (2) the government did not disclose this information; and (3) this information indicated the substance produced in appellant's case was not methamphetamine.

Appellant argues that although the exculpatory information, in the form of negative laboratory results, came to light after his guilty plea, the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), nonetheless requires the government to provide him with exculpatory information—even after the gavel has fallen. Appellant asserts the government's failure to disclose this information deprived him of his right to constitutional due process and the post-trial clemency rights afforded him under the UCMJ and Rules for Courts-Martial. Appellant further asserts government counsel had an ethical obligation to provide the laboratory results to the defense. Appellant claims the appropriate remedy in this case is dismissal of the charge and its specification because the military judge previously dismissed with prejudice the lesser included offense of attempt to manufacture methamphetamine. In the alternative, appellant asks this court to affirm only the offense of attempted manufacture of methamphetamine. We find under the facts of this case, a *Brady* violation occurred in that the government, prior to convening authority action, had in its possession exculpatory information material to guilt or punishment that it did not disclose. As such, we provide relief in our decretal paragraph.

### *Application of Brady in the Post-Trial Context*

The Due Process Clauses of the Fifth and Fourteenth Amendments impose certain duties upon the government to ensure "that 'justice shall be done'" in all criminal prosecutions. *United States v. Agurs*, 427 U.S. 97, 111 (1976) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). In *Brady*, the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution." 373 U.S. at 87.

In subsequent cases, the Supreme Court provided guidance on judging *Brady* claims. To establish that a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) the government suppressed the evidence, "either willfully or inadvertently;" and (3) the information was material in that "prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004). A successful *Brady* claim, by its nature, calls into question the underlying conviction or sentence. Because it is a constitutional obligation, the Supreme Court later instructed that *Brady* evidence must be disclosed regardless of whether the defendant

5

makes a request for exculpatory evidence. *Agurs*, 427 U.S. at 107. With regard to materiality, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (separate opinion of Blackmun, J., joined by O'Connor, J.). A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Id.*

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court explained:

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . . *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434 (citing Bagley, 473 U.S. at 678).

The Supreme Court elaborated:

> [O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review. Assuming *arguendo* that a harmless-error enquiry were to apply, a *Bagley* error could not be treated as harmless, since a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the . . . verdict.

*Kyles*, 514 U.S. at 435 (internal quotation marks and citations omitted).

Under *Brady* and its progeny, it is firmly settled that a criminal defendant has a constitutional right to obtain all material evidence—known to the government

6

*before and during* trial—that is favorable to the defendant's case. The Supreme Court's application of *Brady* in a post-trial context is less clear.[3]

Numerous federal and state courts have extended *Brady* in the post-conviction context.[4] However, in 2009, the Supreme Court found the government does not have a continuing *Brady* obligation post-conviction, and the Constitution does not require states to turn over evidence post-conviction for DNA testing. *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009). The Court reasoned that *Brady* provides no support for such a constitutional right and that "'once a defendant has been afforded a fair trial and convicted . . . the presumption of innocence disappears.'" *Id.* at 69 (quoting *Herrera v. Collins*, 506 U.S. 390, 399 (1993)). The convicted have "only a limited interest in post-conviction relief." *Osborne*, 557 U.S. at 69. However, here, we readily distinguish *Osborne's* applicability to the current scenario.

*Osborne* dealt with a collateral attack—not a scenario where the conviction was not yet final. Both the conviction and sentence had already been affirmed on direct appeal in *Osborne*. *Id.* at 58. Furthermore, Osborne sought the opportunity to access and test DNA evidence already in the possession of the government with the hope of producing yet uncreated exculpatory results. While finding post-conviction due process rights are "not parallel" to trial due process rights, the Supreme Court did not unambiguously foreclose the possibility that *Brady* obligations may continue through direct appeal. *Id.* at 69.

Prior to *Osborne*, the Supreme Court signaled that a prosecutor's *Brady* duties may indeed survive the conclusion of trial. *See Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) (observing that after a conviction, prosecutors are "bound by the ethics of [their] office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction"). As far back as 1915, the Supreme Court held that when a state grants a criminal defendant a right to direct appeal, "the proceedings in the appellate tribunal are . . . part of the process

---

[3] Brendan Max, *The Duty to Disclose Exculpatory Evidence Discovered After Trial*, 94 Ill. B.J. 138 (2006).

[4] *High v. Head*, 209 F.3d 1257 (11th Cir. 2000) (a state's duty to disclose is ongoing); *Thomas v. Goldsmith*, 979 F.2d 746 (9th Cir. 1992) (a state should turn over exculpatory evidence relevant to a habeas corpus proceeding); *Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986) (the duty to disclose is ongoing and extends to all stages of the judicial process); *Curl v. Superior Court*, 44 Cal. Rptr. 3d 320 (Cal. Ct. App. 2006); *Duckett v. State*, 918 So.2d 224 (Fla. 2005), *cert. denied*, 549 U.S. 846 (2006) (noting the existence of a continuing duty to disclose); *State v. Bennett*, 81 P.3d 1 (Nev. 2003) (the state has an affirmative duty to disclose before during and after defendant has been convicted); *People v. Garcia*, 22 Cal. Rptr. 2d 545 (Cal Ct. App. 1993) (the duty to disclose does not end when trial is over).

of law under which he is held in custody by the state, and to be considered in determining any question of alleged deprivation of his life or liberty contrary to the Fourteenth Amendment." *Frank v. Mangum*, 237 U.S. 309, 327 (1915); *see also Evitts v. Lucey*, 469 U.S. 387, 393 (1985) ("[I]f a State has created appellate courts as an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant, . . . the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution.") (internal quotation marks and citations omitted).

More recently, the United States Court of Appeals for the Seventh Circuit observed that:

> [A] defendant's conviction is not final as a matter of law until he exhausts the direct appeals afforded to him, and, until that exhaustion, he is entitled to the full breadth of due process available. *See also Gonzalez v. Thaler*, 132 S.Ct. 641, 645–46, 652–54 . . . (2012) (holding that "[f]or petitioners who pursue direct review all the way to [the Supreme Court], the judgment becomes final at the conclusion of direct review—when this Court affirms a conviction on the merits or denies a petition for certiorari [and that] [f]or all other petitioners, the judgment becomes final at the expiration of the time for seeking such review—when the time for pursuing direct review in this Court, or in state court, expires"); *Skinner v. Switzer,* 131 S.Ct. 1289, 1303 . . . (2011) (Thomas, J., dissenting) (explaining that "[t]rial procedures are used to initially convict a prisoner; appellate procedures review the validity of that conviction *before it becomes final;* and collateral review procedures permit challenge to the conviction after it is final") (emphasis added).

*Fields v. Wharrie*, 672 F.3d 505, 515 (2012).

The Seventh Circuit further instructed that the government's *Brady* obligations "remain in full effect on direct appeal and in the event of retrial because the defendant's conviction has not yet become final, and his right to due process continues to demand judicial fairness." *Id.*[5]

---

[5] *See also Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made. Thus disclosure prior to trial is not mandated. Indeed, *Brady* requires disclosure of information that the

### *Brady Application Post-Trial and Prior to Convening Authority Action*

Although a military member may have been convicted and sentenced at a court-martial, the "direct appeal" process is not complete. "Direct appeal" in the military continues *at least* through the respective Court of Criminal Appeals review. An accused's appeal to his or her respective Court of Criminal Appeals ("service court") in qualifying cases is a matter of right, whereas review by the Court of Appeals for Armed Forces (CAAF) is discretionary in most cases.[6] *See* R.C.M. 1209.

More significantly, however, even before a military case is reviewed by a service court on direct appeal, it is first reviewed by the court-martial convening authority (CA). Congress has provided servicemembers with a unique additional right of review for convicted military personnel whereby the CA reviews each case, pursuant to Article 60, UCMJ. This review is performed and action taken, in most cases, with the advice of specifically assigned judge advocates pursuant to Articles 6 and 60(d), UCMJ.

Article 60, UCMJ, also directs the CA to take action on the findings and sentence of a court-martial only after consideration of any matters submitted by the accused. The CA is empowered with the "sole discretion," as a "matter of command prerogative" after receiving a written recommendation from a staff judge advocate officer, to "approve, disapprove, commute, or suspend the sentence in whole or in part." UCMJ art. 60. This review precedes an appeal by the accused to his or her respective service's court of criminal appeals pursuant to Article 66, UCMJ, and their right to petition for review by the CAAF pursuant to Article 67, UCMJ.

The accused may submit any matter to the CA that may reasonably tend to affect the CA's decision whether to approve or disapprove any findings of guilty, the sentence, or any portion thereof. R.C.M. 1105. Submissions may include new

---

prosecution acquires during the trial itself, or even *afterward*.") (emphasis added) (internal citations omitted).

[6] If the sentence, as approved by the convening authority, includes death, a bad-conduct discharge, a dishonorable discharge, dismissal of an officer, or confinement for one year or more, the case is reviewed by the Court of Criminal Appeals of that military Service. Pursuant to Article 67(a), UCMJ, the Court of Appeals for the Armed Forces shall review the record in: 1) all cases in which the sentence, as affirmed by a Court of Criminal Appeals, extends to death; 2) all cases reviewed by a Court of Criminal Appeals which the Judge Advocate General orders sent to the Court of Appeals for the Armed Forces for review; and 3) all cases reviewed by a Court of Criminal Appeals in which, upon petition of the accused and on good cause shown, the Court of Appeals for the Armed Forces has granted a review.

evidence; clarification of matters presented at trial; allegations of errors affecting the legality of the findings or sentence; portions or summaries of the record and copies of documentary evidence offered or introduced at trial; matters in mitigation which were not available for consideration at the court-martial; and clemency recommendations by any member, the military judge, or any other person.  R.C.M. 1105(b).

Currently, the CA has wide discretion and may for any or no reason, disapprove the findings, or may dismiss any offense, or change the finding of guilty of any offense to one of a lesser included offense.  The CA may also disapprove all, or any part of, a legal sentence.  The CA also has the power to reduce or suspend a sentence, or change the punishment to one of a different nature.[7]  Additionally, the CA has the ability under R.C.M. 1107 to consider matters outside the record and to order a rehearing should any issue arise that warrants further examination.

Prior to taking final action pursuant to Article 60, UCMJ, the convening authority must consider the results of trial, the recommendation of the Staff Judge Advocate pursuant to R.C.M. 1106, and any post-trial clemency matters submitted by the accused and his attorney.

Given this case had not yet reached the convening authority when the investigator offered testimony at PFC BB's Article 32, UCMJ, hearing relating to the purported negative drug laboratory test results, we find the government's *Brady* obligations with respect to those lab results applied in this setting.[8]  We take issue with the government's failure to disclose "previously-produced forensic evidence, the testing of which concededly could prove beyond any doubt that the defendant did not commit the crime for which he was convicted . . . ."  *Harvey v. Horan*, 285 F.3d 298, 317 (4th Cir. 2002) (Luttig, J., respecting the denial of rehearing *en banc*).  It would seem "the very same principle of elemental fairness that dictates pre-trial production of all evidence dictates post-trial production" as well.  *Id.*

Here, the government had in its possession presumably exculpatory laboratory results during the pendency of appellant's R.C.M. 1105 and 1106 submission which

---

[7] These provisions were in effect during the pendency of this case.  It is subject to change after 24 June 2014, when Congressional modification to CA power will take effect.  *See* 10 U.S.C. § 860 (2012), *amended by* National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66 §1702(b), 127 Stat. 672, 955–58 (2013).

[8] *Brady* and its progeny do not require "the prosecution to review records that are not directly related to the investigation of the matter that is the subject of the prosecution, absent a specific request indentifying the entity, the type of records, and the type of information."  *United States v. Williams*, 50 M.J. 436, 443 (C.A.A.F. 1999); *see also United States v. Joseph*, 996 F.2d 36 (3d Cir. 1993).

it did not provide to appellant or the CA.[9]  This new information suggested appellant may have been not guilty of a charge of which he was found guilty.  This exculpatory evidence, in the possession of the government before convening authority action, should have been turned over to the defense to allow them the opportunity to present it to the convening authority.[10]

### *Materiality of the Non-disclosed Information*

Having determined that the laboratory results should have been disclosed, we now turn to materiality.

In a case in which the defense either did not make a discovery request or made only a general request for discovery, appellant will be entitled to relief only by showing that there is a "reasonable probability" of a different result at trial if the undisclosed evidence had been disclosed.  *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J., joined by O'Connor, J.); *Hart*, 29 M.J. at 410; *see also Cone v. Bell*, 556 U.S. 449 (2009); *Strickler*, 527 U.S. at 290.  It simply is not sufficient, therefore, to claim that "there is a reasonable *possibility* that . . . testimony might have produced a different result . . . ."  *Strickler*, 527 U.S. at 291.  Appellant's burden is to "establish a reasonable *probability* of a different result."  *Id*.

While the investigator's testimony is not dispositive as to what was manufactured that day in appellant's laundry room—that is not the question we must address.[11]  The question is whether, in the absence of the withheld laboratory results, the appellant received a fair trial "worthy of confidence" in the outcome.  *Kyles*, 514

---

[9] We note that we must presume, although we are unable to confirm, the laboratory results were exculpatory because the government still has not disclosed the results.

[10] Given that the actual laboratory results are the property of the United States government, there is no way the defense counsel could have obtained the lab results without the intervention and assistance of the government.

[11] This case involves exculpatory information versus impeachment evidence.   Under *Brady*, failure to disclose impeachment evidence is viewed with no less significance than a failure to disclose exculpatory evidence; however, there is a distinction between exculpatory information and impeachment information in practical application of the materiality analysis.  Exculpatory evidence primarily includes evidence which tends to directly negate an element of the charged offense by its very nature.  In this case, if true, the objective scientific information could make the trial result a factual impossibility in that the substance produced was not methamphetamine.  In contrast, impeachment evidence consists of evidence which tends to impeach or contradict a government witness.  In those cases, it would be more difficult to prove materiality.

U.S. at 434. We, therefore, ask if appellant had known of the laboratory results and been able to present them to the convening authority, would they have brought into question the factual underpinning of a charge of which appellant was found guilty. Again, the standard is one of whether the facts are called into question, not whether that question can be refuted.

If appellant had knowledge of the information prior to CA action, appellant could have requested the CA consider that information and approve only a conviction for an attempt to manufacture methamphetamine. Not disclosing the information in a timely fashion deprived appellant of that opportunity.

Given that the factual predicates for the Article 112a, UCMJ, charge and specification in PFC BB's case and appellant's case are the same, we find there is a reasonable probability of a different result had the information been disclosed and presented. Specifically, there is a reasonable probability that the CA would have approved only an attempt to manufacture methamphetamine in appellant's case just as he did in appellant's co-actor's case.[12]

### *Remedy*

Having found that a *Brady* violation occurred before action, we must determine the appropriate remedy. We could return the case to the convening authority or authorize a fact finding hearing. Out of judicial economy and consistent with appellant's requested relief, however, we will affirm only the offense of attempt to manufacture methamphetamine. *See* UCMJ art. 79. That is not only what

---

[12] The dissent asserts that in any race to the courthouse, certain risks are taken and that discovery of exculpatory evidence may be one of these risks. *United States v. Hawkins*, __ M.J. __, slip op. at __ (Army Ct. Crim. App. __ Apr. 2014) (Krauss, J., dissenting). This is certainly true in a mature judicial system and is a legitimate tactical decision made by an accused with the advice of his attorney. However, one of those assumed risks should not be a deprivation of the process that is still due.

It would be a mistake to read the majority opinion as suggesting appellant is getting the benefit of his bargain pretrial and then getting a second bite at the bargain post-trial. Instead, in this case we examine the government's obligations to ensure fair process throughout the court-martial—which of necessity includes the government's duties through action by the CA. These duties include the government's obligation to ensure material evidence of guilt or innocence is brought to the attention of trial participants. If the CA has authority to disapprove a finding of guilty post-trial as he does under the law applicable to this case, he should have matters material to such a determination prior to taking action—regardless of whatever tactical calculation the accused and his counsel may have made.

the appellant requests, but also the very best result with respect to findings he could have hoped for if the case were returned for further disposition.[13]

While the military judge dismissed with prejudice the separately charged Article 80, UCMJ, lesser included offense of attempted manufacture of methamphetamine, we find this had no effect on the remaining greater charge of which appellant was convicted. This court still has the authority to sustain a finding of guilty as to the lesser included offense. UCMJ arts. 59(b), 79. The dismissal of the lesser included offense merely effectuated R.C.M. 307(c)(4) which states that in no case should both an offense and a lesser included offense thereof be separately charged. Under the present circumstances, dismissal of the explicitly charged lesser included offense does not preclude our full and complete review of the greater offense or prevent this court from entering a finding of guilty to the lesser crime of attempt.

## CONCLUSION

Upon consideration of the entire record and the submissions by the parties the court affirms only so much of the finding of guilty of the Specification of Charge III as finds that appellant did:

> at or near Fort Campbell, Kentucky, between on or about 25 September 2011 and 26 September 2011, attempt to wrongfully manufacture 1 gram of methamphetamine, in violation of Article 80, UCMJ.

The remaining findings of guilty are AFFIRMED.

Based on the foregoing, we are able to reassess the sentence on the basis of the error noted and do so after conducting a thorough analysis of the totality of the circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

---

[13] Looking at the context of the entire record regarding the attempt to manufacture methamphetamine, in accordance with *United States v. Redlinski*, 58 M.J. 117, 119 (C.A.A.F. 2003), we find the accused was aware of the elements, both explicitly and inferentially. Here, appellant admitted to purchasing pseudoephedrine knowing PFC BB intended to manufacture methamphetamines. Appellant also admitted he specifically intended to manufacture methamphetamines. Under these circumstances, the record objectively reflects appellant understood his actions went beyond preparatory steps and were a direct movement toward the commission of the intended offense. Thus, an adequate factual predicate for the offense of attempted manufacture was established in this case.

In evaluating the *Winckelmann* factors, we first find no dramatic change in the penalty landscape or exposure. Appellant's maximum punishment for attempt was the same as that for the underlying offense of manufacturing methamphetamine. *See Manual for Courts-Martial, United States* (2012 ed.) pt. IV, ¶ 4(e). We note appellant pleaded guilty in a judge alone court-martial. The nature of the remaining offenses captures the gravamen of the original charges and the significant circumstances surrounding appellant's conduct remain admissible and relevant to the remaining offenses. Finally, based on our experience, we are familiar with the remaining offenses so that we may reliably determine what sentence would have been imposed at trial.

After reassessing the sentence and the entire record, we AFFIRM the approved sentence. We find this purges the error in accordance with *Sales and Winckelmann*, and is also appropriate under Article 66(c), UCMJ. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by this decision are ordered restored.

Chief Judge PEDE, Senior Judge KERN, Senior Judge COOK, Senior Judge LIND, Judge ALDYKIEWICZ, Judge HAIGHT, Judge MARTIN, and Judge BORGERDING concur.


KRAUSS, Judge, dissenting:

I agree that *Brady* disclosure requirements apply post-trial through the completion of direct appeal that ends with the Supreme Court. *See Imbler v. Pachtman,* 424 U.S. 409, 427 n.25 (1976); *Fields v. Wharrie,* 672 F.3d 505, 514-515 (7th Cir. 2012); *Leka v. Portuondo* 257 F.3d 89, 100 (2d Cir. 2001); *United States v. Behenna*, 71 M.J. 228, 246 (C.A.A.F. 2012) (Effron, J. dissenting). Whether a broader obligation to disclose under Article 46, Uniform Code of Military Justice [hereinafter UCMJ] UCMJ and Rule for Courts-Martial [hereinafter R.C.M.] 701 extends beyond the end of trial is another question. *See United States v. Lofton,* 69 M.J. 386, 390 (C.A.A.F. 2011); *United States v. Simmons,* 38 M.J. 376, 381-82 (C.M.A. 1993) (distinguishing government obligations under R.C.M. 701 and *Brady v. Maryland*, 373 U.S. 83 (1963)); *Simmons*, 38 M.J. at 383 (Gierke, J. concurring); *see also United States v. Campbell*, 57 M.J. 134 (C.A.A.F. 2002) (discussing parameters of appellate discovery). What we can say is that when an accused pleads guilty without the benefit of full discovery he takes certain risks that bear certain consequences, not the least of which is the risk that he and his lawyer may have failed to appraise the quality of the government's evidence against them. *See McMann v. Richardson,* 397 U.S. 759, 770 (1970); *Brady v. United States*, 397 U.S. 742, 756-57 (1970); *see also United States v. King*, 30 M.J. 59, 68-69 (C.M.A. 1990) (*McMann* applicable to direct appeals). Secondly, where an accused fails to request discovery of the specific material in question and does nothing to discover that material himself, where that material is reasonably discoverable by a reasonably

diligent defense counsel, he is in no position to complain about what might otherwise constitute a "*Brady* violation." *See Simmons*, 38 M.J. at 382 (citing *United States v. Wilson,* 901 F.2d 378 (4th Cir. 1990)); *United States v. Hicks,* 848 F.2d 1 (1st Cir. 1988); *Jarrell v. Balkcom,* 735 F.2d 1242 (11th Cir. 1984); *United States v. LeRoy,* 687 F.2d 610, 618-19 (2d Cir. 1982), *cert. denied*, 459 U.S. 1174 (1983); *Gollaher v. United States,* 419 F.2d 520 (9th Cir. 1969), *cert. denied,* 396 U.S. 960 (1969); *see also United States v. Garlick*, 61 M.J. 346, 351 (C.A.A.F. 2005).

Because here the appellant decided to plead guilty without the benefit of full discovery, failed to request discovery of the type of material at issue, and failed to discover the material himself despite the fact that such evidence was readily discoverable, the question is not whether and how he obtains relief for any ostensible *Brady* violation but whether his defense counsel was ineffective. *See Tollett v. Henderson*, 411 U.S. 258 (1973); *McMann*, 397 U.S. 759; *Simmons,* 38 M.J. at 382 n.3; *United States v. Moussaoui*, 591 F.3d 263, 278-81, 285-90 (4th Cir. 2010) (applying *Brady v. United States*, 397 U.S. 742, and *McMann*, 397 U.S. 759, on direct appeal relative to a *Brady v. Maryland*, 373 U.S. 83, issue); *see also United States v. Brozzo*, 58 M.J. 284 (C.A.A.F. 2003) (summ. disp.) (setting aside Air Force Court decision, *United States v. Brozzo*, 57 M.J. 564 (A.F. Ct. Crim. App. 2002), and remanding to Air Force Court for consideration of an ineffective assistance of counsel issue under asserted *Brady* violation circumstances); *United States v. Brozzo*, 60 M.J. 310 (C.A.A.F. 2004) (summ. disp.) (reversing the subsequent Air Force Court decision, *United States v. Brozzo*, ACM 34542, 2003 WL 22047904 (A.F. Ct. Crim. App. 26 Aug. 2003), that held no ineffective assistance of counsel, in light of a government concession of a prejudicial discovery violation, referring to *United States v. Jackson*, 59 M.J. 330 (C.A.A.F. 2004), which ultimately relied on R.C.M. 701 in its holding).

Appellant bears the risk of regretting his plea of guilty by discovering, after sentence is announced, that he and his lawyer may have jumped the gun a bit in presuming that the substance seized by the police is what the government says it is absent scientific test results being complete. The fact that he is now in possession of summarized hearsay testimony of a police investigator from his co-conspirator's (PFC BB's) Article 32, UCMJ, investigation that is ultimately ambiguous as to the supposed nature of the substance at issue is not a substantial basis to question the plea. *See United States v. Stokes*, 65 M.J. 651 (Army Ct. Crim. App. 2007); *United States v. Kelly*, 32 M.J. 813 (N.M.C.M.R. 1991).[14]

---

[14] It is unclear whether or to what extent the majority relies on the stipulation of fact in Private First Class BB's case in deciding that the government in this case violated the *Brady* rule. I find no authority, and the majority cites no authority, for the proposition that a stipulated fact in one case is relevant and available to establish the existence of the same fact in a related but separately adjudicated case. *See Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J. dissenting) (citing *United States v. Powers*,

There is no doubt that if the United States were in possession of such information before or at the time of appellant's plea and failed to disclose it, we would be in a significantly different situation. *See, e.g., Garlick*, 61 M.J. 346; *Simmons*, 38 M.J. 376. It would certainly be the case if appellant had requested discovery of such information and was willing to wait until its production before entering a plea. *See Garlick*, 61 M.J. 346. However, appellant fails to establish a R.C.M. 701 violation, let alone a *Brady* violation, prior to or at the time of his guilty plea. He does not assert that with this information his plea would have been different. He neither asserts nor does the record reveal any affirmative misrepresentation by the United States, coercion to plead guilty, or infirmity of appellant, at the time of his plea, to do so providently. Therefore, there is no substantial basis to question that plea. *See Tollett*, 411 U.S. 258; *McMann*; 397 U.S. 759; *Moussaoui*, 591 F.3d 263; *Garlick*, 61 M.J. 346.

The majority apparently blurs obligations under R.C.M. 701 and *Brady* and thereby invites the perverse results that follow: an accused who enjoys no relief for a *Brady* violation before his guilty plea now enjoys complete relief for a *Brady* violation occurring after acceptance of his provident plea. *See United States v. Ruiz*, 536 U.S. 622 (2002);[15] *United States v. Conroy*, 567 F.3d 174, 178-79 (5th Cir. 2009); *see also Moussaoui*, 591 F.3d at 278-81; *McCann v. Mangialardi*, 337 F.3d 782, 787-88 (7th Cir. 2003). The majority does not hold that the higher disclosure obligations of Article 46, UCMJ, and R.C.M. 701 apply post-conviction. *See, e.g., United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004); *Simmons*, 38 M.J. 376. There is good reason for this: R.C.M. 701(d) imposes a continuing duty to disclose before or during the court-martial and is based on the federal rule of discovery and American Bar Association standards relative to discovery before and during trial. R.C.M. 701(d); R.C.M. 701(d) analysis at A21-34.

Nor does the majority rely on this court's authority under Article 66, UCMJ, to rectify an injustice that warrants correction. *See generally United States v. Nerad*, 69 M.J. 138 (C.A.A.F. 2010). Instead, it seems to rely more on a notion like that of "military due process," a concept recently cashiered by our superior court. *United States v. Vazquez*, 72 M.J. 13, 19 (C.A.A.F. 2013). As here discussed, under circumstances such as those present in this case, an appellant's Constitutional rights

---

467 F.2d 1089, 1097 (7th Cir. 1972) (Stevens, J. dissenting) (lamenting the ability of the United States to take inconsistent positions in related cases)).

[15] It is also important to note that the majority opinion fails to recognize that Supreme Court precedent certainly precludes advance of any *Brady* violation claim relative to a guilty plea based on nondisclosure of material impeachment evidence. *United States v. Ruiz*, 536 U.S. 622, 629 (2002); *see also Moussaoui*, 591 F.3d at 286.

16

to the fairness and integrity of his convictions and sentence are enforced through the Sixth Amendment guarantee of the effective assistance of counsel, not the Fifth Amendment Due Process Clause. *See Moussaoui*, 591 F.3d at 279 (citing *Blackledge v. Perry*, 417 U.S. 21, 29-30 (1974)), 285-90; *Stokes*, 65 M.J. at 656-57.[16]

Absent action by Congress or the President to define post-conviction discovery rules for the military justice system, we are left with the responsibility to enforce the *Brady* line of cases as fully defined by the common law. As referenced above, this line of cases is not so forgiving of defense counsel's failures or the ramifications of tactical decisions made by counsel or choices made by an appellant before and during a guilty plea. In addition, the *Brady* rule should not be applied where a reasonably diligent defense counsel could have readily obtained the evidence that was not otherwise disclosed. *See Cobb v. Thaler*, 682 F.3d 364, 378-79 (5th Cir. 2012); *Spirko v. Mitchell*, 368 F.3d 603, 610-11 (6th Cir. 2004); *Boss v. Pierce*, 263 F.3d 734, 740-41 (7th Cir. 2001); *Barnes v. Thompson*, 58 F.3d 971, 975-76 (4th Cir. 1995).

Applying the law that we have to the question of whether the United States denied appellant a fair opportunity for clemency or corrective action from the convening authority in this case, because it failed to disclose favorable information discovered after trial, appellant loses.[17] To the extent the *Brady* rule applies after acceptance of a provident guilty plea, where an appellant fails to specifically request discovery of such material and fails to obtain and exploit the matter himself when it is readily available for discovery, he surrenders opportunity to fix blame on the United States for what might otherwise warrant relief. *See Wilson*, 901 F.2d 378; *Garlick*, 61 M.J. 346; *Simmons*, 38 M.J. 378.

It is plain from this record that a reasonably diligent defense counsel could have readily obtained the information about which appellant now complains.

---

[16] And so much the better, a guilty plea relieves the United States of its burden to prove an accused guilty at a fair trial, ensuring the accuracy of the plea through the Sixth Amendment rather than the Fifth, under circumstances such as these, enforces the responsible and prompt litigation and resolution of such matters at the trial level, and before action, rather than rewarding happenstance discovery upon post conviction review, while respecting a soldier's choice to plead guilty after consultation with his counsel. This is increasingly important as Congress limits the discovery purpose of the Article 32, UCMJ, investigation and the authority and discretion of the convening authority to effectively address issues like those in this case.

[17] *See District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 69-70 (2009) (Supreme Court relying on post-trial discovery processes of individual jurisdictions, on direct appeal, to resolve this sort of problem.).

Indeed, appellant's trial defense counsel followed and made reference to PFC BB's case in his R.C.M. 1105 matters submitted to the convening authority. This fact is enough to establish that appellant's defense counsel could have readily discovered PFC BB's plea of attempt rather than manufacture of methamphetamine and the reasons for it.[18] *See, e.g.*, *Westley v. Johnson*, 83 F.3d 714, 725-26 (5th Cir. 1996) (no *Brady* violation where transcript of co-defendant's case containing favorable information for defense was readily available) and cases cited above relevant to readily discoverable evidence and *Brady*. Private First Class BB was tried by the same office on charges referred by the same convening authority at the same installation within a few months of appellant's own trial and two weeks prior to submission of appellant's R.C.M. 1105 matters. Appellant offers no explanation as to why he limited reference to PFC BB's sentence rather than the full facts of PFC BB's case. It appears from the record and the affidavit of appellant's counsel that they both simply presumed the substance was methamphetamine without thinking much further about it (there was apparently at least a field test that showed positive for methamphetamine), as appellant now presumes it was not methamphetamine based on the related proceedings discussed.

Of course, when the United States accuses a soldier of manufacturing a contraband substance, they will likely submit that substance for testing by an accredited laboratory before subjecting that soldier to a potential criminal conviction and deprivation of liberty. The defense can request such testing. The soldier can also plead not guilty and force the government to prove his guilt.

It makes sense that the government might forgo the expense and time of testing that substance, if the accused soldier insisted he could enter a provident plea without the need for any such confirmation. It also makes sense that that soldier's defense counsel might reasonably rely on his client's insistence despite counsel's advice that laboratory testing might reveal otherwise and as long as the soldier understood the risk he was taking by pleading guilty prior to full discovery. The law requires we presume defense counsel did just that. *See generally United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006). More problematic for defense counsel is that neither the record of trial, allied papers or appellate filings suggest he made any

---

[18] The majority assumes the existence of an exculpatory laboratory report and its contents though there is no such report in the record of either this case or the case of appellant's co-conspirator. In a case like this, where there is, at best, the possible existence of conflicting evidence on the subject of the nature of an alleged contraband substance, rather than evidence of actual innocence, for example, the relief provided by the majority is rather extraordinary. Appellant admitted, under oath and after being advised of his rights to trial, that the substance produced was methamphetamine. He did this after receipt of a police report stating that the substance seized was methamphetamine. Presuming the existence of a report of scientific evidence, whose contents and accuracy are untested because of appellant's guilty plea, is frail basis to disapprove an otherwise reliable finding of guilty.

discovery request let alone request for the type of information at issue. But appellant does not assert that his defense counsel was deficient in his advice or in failing to present matter to the convening authority that might have obtained some corrective action.

Because appellant fails to make a cognizable *Brady* violation claim and because he makes no claim of ineffective assistance of counsel, and the record is insufficient by itself to establish ineffective assistance, I cannot join the majority opinion.

FOR THE COURT:

ANTHONY O. POTTINGER
Acting Clerk of Court